IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT ANDRADE,                          No. 3:21-cv-00860-HZ

                    Plaintiff,           OPINION & ORDER

v.

SCHNITZER STEEL INDUSTRIES, INC.,
an Oregon Corporation; CASCADE
STEEL ROLLING MILLS, INC., an
Oregon Corporation, and DIANA
ZOLOTKO,

                    Defendants.


Daniel Snyder
Carl Post
John Burgess
Law Offices of Daniel Snyder
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205

          Attorneys for Plaintiff

Edwin A. Harnden
Chris M. Morgan
Alysha D. Phelps
Barran Liebman LLP
601 S.W. Second Avenue, Suite 2300
Portland, Oregon 97204-3159

          Attorneys for Defendants

HERNÁNDEZ, District Judge:

This matter comes before the Court on Defendant's Motion to Strike, ECF 56, and Defendants' Motion for Summary Judgment, ECF 44. For the reasons that follow, the Court grants in part and denies in part Defendant's Motion to Strike and grants Defendants' Motion for Summary Judgment.

## BACKGROUND

The following facts are taken from Plaintiff's Second Amended Complaint ("SAC") and the parties' materials related to Defendants' Motion for Summary Judgment:

Plaintiff Robert Andrade was hired by Defendant Cascade Steel Rolling Mills ("CSRM")[1] in 2006 and worked for CSRM and Defendant Schnitzer Steel Industries (together "Schnitzer") from 2006 through his termination in 2020. Plaintiff was deployed as part of his military service from 2009 through 2010 and again from 2014 through 2015. When Plaintiff returned to Schnitzer after his military service in 2015 he believed he did not receive appropriate pay in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq*. Morgan Decl., ECF 45, Ex. 5 (Pl. Dep.) at 8. Schnitzer's Human Resources Manager in 2015, Greg Moore, and Schnitzer's Superintendent of Ferrous Logistics, Craig Hlady, evaluated Plaintiff's wages and increased Plaintiff's salary. Morgan Decl., Ex. 1 (Hlady Dep.) at 2-3.

In August 2018 Moore retired from Schnitzer. On November 15, 2018, Defendant Diana Zolotko began working for Schnitzer as a Human Resources Manager. On July 2, 2019, Hlady sent Zolotko an email in which he noted Plaintiff had "asked [Hlady] for a raise multiple times

---

[1] CSRM is a wholly-owned subsidiary of Schnitzer Steel Industries.

recently." Hlady Decl., ECF 49, Ex. 1 at 1. Hlady noted Plaintiff "visited [him] on his day off to specifically talk . . . about a raise." *Id*. Plaintiff advised Hlady that "he might go to a JAG . . . in the belief that he is underpaid compared to his peers because of his previous military duty. He [also] . . . brought this up a couple of years ago, and after Greg [Moore] and I reviewed his pay compared to other transportation foremen, we . . . bumped his pay up." *Id*. Hlady, however, told Plaintiff in 2019 that he did not "intend to do anything until merit time rolls around." *Id*.

On August 14, 2019, Plaintiff met with Zolotko to discuss his wages. Zolotko's contemporaneous notes reflect Plaintiff stated he did not get raises three times because he was in the military and although Moore fixed one of the raises, he did not receive the other two raises. Zolotko Decl. ECF 50, Ex. 1 at 1. Plaintiff testified at deposition that his request to Zolotko for a pay increase "was not because of a disability . . . [i]t was because of USERRA," which he "believed had been violated." Morgan Decl., Ex. 5 at 10. Specifically, Plaintiff "did not believe that [his] . . . pay was compliant with USERRA." *Id.* at 11. Zolotko advised Plaintiff that his salary would be reviewed at the same time as other Schnitzer employees. Zolotko alleges that at that point Plaintiff "raised his voice, pressed his clenched fists on [her] desk, and leaned toward [her] saying . . . [she] did not know the law." Zolotko Decl. ¶ 3. Plaintiff denies pressing his clenched fists on Zolotko's desk and notes he sometimes speaks loudly because he has some hearing loss.

On September 20, 2019, Plaintiff's manager, Cameron West, completed Plaintiff's 2019 performance review and rated Plaintiff a 2.86 out of 5 (development needed). West rated Plaintiff as "met" or "above" expectations in four areas and "development needed" in the areas of decisionmaking integrity, and teamwork. Morgan Decl., Ex. 5 at 14-16.

On October 8, 2019, Plaintiff met with Schnitzer Vice President and Chief Ethics and Compliance Officer, Callie Pappas. Pappas' contemporaneous notes of their meeting indicate Plaintiff alleged he had not received two pay increases in violation of USERRA. Pappas Decl., ECF 48, Ex. 1 at 1. Plaintiff told Pappas that he spoke with Zolotko about USERRA, but she got angry when Plaintiff suggested she did not understand USERRA. *Id*. Plaintiff also told Pappas that he believed West was "told [by Zolotko] to 'change some verbiage'" on Plaintiff's 2019 performance evaluation in retaliation for talking to Zolotko about USERRA. *Id*. at 3-4. Pappas testified at deposition that Plaintiff did not discuss any health conditions with her, tell her that he suffered from post-traumatic stress disorder ("PTSD") or a traumatic brain injury ("TBI"), or advise her that he had a disability rating from the Veterans' Administration ("VA"). Snyder Decl., ECF 53, Ex. 32 at 9.

On October 11, 2019, Pappas initiated a complaint via Schnitzer's EthicsPoint system[2] in which she noted Plaintiff made three allegations during their meeting:

> 1) that [Schnitzer] has failed to comply with federal law regarding employees deployed for active military duty when it provided him with a 1% merit increase in 2014; 2) that HR Director Diana Zolotko is a bully; and 3) that there is retaliation against him for raising these concerns in the form of a negative performance review.

Creighton Decl., ECF 47, Ex. 1 at 2.

On October 29, 2019, Schnitzer Steel Human Resources Business Partner, Kendra Creighton, concluded Plaintiff's allegations were unsubstantiated and closed the EthicsPoint complaint. Creighton found Schnitzer fully complied with USERRA and that West gave Plaintiff the score of 2.86 "due to [Plaintiff's] behavior over the past year," "without pushback" from Zolotko  Creighton Decl., Ex. 1 at 5. West explained

---

[2] EthicsPoint is Schnitzer's ethics reporting system. Snyder Decl., Ex. 32 at 5.

> there have been many incidents in which [Plaintiff] goes about actions in
> inappropriate ways and needs to work on the areas in which he did not
> meet expectations. In the review, [West] gives specific examples. [West]
> said that the only pushback he got from [Zolotko] on this review was to
> remove one sentence from a comment (which he can't remember exactly
> what it was as it was not material). This push-back did not change the
> overall outcome of the review.

*Id*. Creighton also found Plaintiff's allegation that Zolotko was a bully was unfounded but

concluded Zolotko could improve her communication style. Accordingly, Creighton

recommended "a verbal counseling session addressing [Zolotko's] unprofessional behavior and

unresponsiveness" and that Schnitzer's President at the time, Jeff Dyck, "coach [Zolotko] to

engage more actively as a leader with her . . . direct reports." *Id*.

On December 19, 2019, Hlady held a meeting with several Schnitzer foremen, including

Plaintiff. As Plaintiff was leaving the meeting West gave Plaintiff a foot-long summer sausage as

a holiday gift.

On December 20, 2019, Hlady sent Zolotko an email in which he advised her that Dennis

Murphy, a foreman at the December 19, 2019 meeting, called Hlady and related the following:

> [S]ometime during the meeting [Plaintiff] engaged in a sexually explicit
> series of text messages with his wife, and then at some point afterwards
> showed the contents of the text messages to foreman Ryan Mullins. As far
> as I understand, Mr. Murphy saw [Plaintiff] pass his phone to Mr. Mullins
> but did not see the content of the messages at that time. However, . . . after
> the meeting . . ., Mr. Mullins shared with a small group (including Mr.
> Murphy but I am not sure who else) the contents of the texts.
>
> Furthermore, at the end of the meeting, Cameron West handed out to
> every individual in our meeting . . . a summer sausage . . . as a token
> holiday gift. Mr. Murphy states that he witnessed [Plaintiff] make a rude
> gesture with the sausage after he received it. I personally did not witness
> this event as this occurred behind my back.

Hlady Decl., Ex. 3 at 1. Zolotko initiated an EthicsPoint complaint on Murphy's behalf on

December 20, 2019, and began an investigation into the allegations.

On January 13, 2020, Zolotko sent an email questionnaire to the attendants of the December 19, 2019 meeting, other than Plaintiff, and asked what, if anything, they knew about the sexually explicit text messages and/or Plaintiff's rude gesture with the summer sausage. Several of the foremen indicated they did not know about the sexually explicit text or see Plaintiff make a rude gesture with the sausage. Mullins, however, responded that he sat next to Plaintiff during the meeting and "[a]bout 20 minutes in while [Hlady] was speaking [Plaintiff] flashed his phone in front of me. . . . It was a text message to his wife that read something like 'get dinner started and get your fart box ready for a tongue punching.'" Zolotko Decl., Ex. 5 at 1. Mullins also noted that West "bought all of us a. . . foot long summer sausage as a Christmas gift which he handed out after the meeting. . . . [Plaintiff] left the meeting at around 4:30 and [West] gave him his. While walking out the door [Plaintiff] stopped, smiled and put the sausage in front of his groin area." *Id*. Mullins explained that after "the meeting adjourned I walked out with Dennis Murphy and he asked me what [Plaintiff] shared with me on his phone and I replied some nasty message to his wife about a tongue punching." *Id*. Mullins stated this kind of behavior by Plaintiff was "common" and "[e]very foreman in our department has either heard verbally from [Plaintiff] or second hand things that he has either said or done at work. This is not an isolated incident. Vulgar language like this, cussing out his crew, throwing water coolers in railcars, kicking holes in office walls, etc." *Id.* Finally, Mullins expressed concern for his safety if Plaintiff learned that Mullins had informed Zolotko about Plaintiff's actions.

Foreman Brennan Andre stated in response to the questionnaire that he

> recall[s] [Mullins] telling [Murphy] and I that [Plaintiff] had told his wife to get dinner ready because he was coming home and I can't recall the specifics of what he said next. I can remember thinking it was something that I would never say to anyone. [Murphy] and I both looked at each other and [Murphy] asked me if I would ever say that to my wife and I said absolutely not.

Zolotko Decl., Ex. 4 at 1. Andre did not see Plaintiff make any rude gesture with the sausage. *Id.*
Foreman Daniel Lovas responded that he "was told [by Mullins] of a message sent by [Plaintiff]
to his wife," but he did not see Plaintiff make a gesture with the sausage. Zolotko Decl., Ex. 6 at
1.

On January 21, 2020, Zolotko, Hlady, and Dyck met to discuss Plaintiff "and his
behavior at the December 19, 2019 Foremen Meeting." Dyck Decl., ECF 46, at ¶ 3. They
reviewed Plaintiff's 2019 performance evaluation and "noted [Plaintiff] had a history of
inappropriate behavior." *Id*. They agreed that Plaintiff's "behavior at the December 19, 2019
Foremen Meeting . . . was inappropriate especially because [Plaintiff] was in a leadership role."
*Id.* Ultimately, they "decided as a group that termination was the appropriate level of discipline
in response to [Plaintiff's] actions during the Foremen Meeting," however, Dyck's "ultimate
approval was required [and he] authorized [Plaintiff's] termination during the meeting." *Id. See
also* Hlady Decl. ¶ 6 ("I could not unilaterally terminate an employee at Schnitzer. Although we
decided as a group that termination was the appropriate level of discipline in response to
[Plaintiff's] actions during the Foremen Meeting, Dyck's ultimate approval was required.");
Zolotko Decl. ¶ 9 (same).

On January 22, 2020, Zolotko called Schnitzer's Chief Security Officer & Director,
Operations Management, Joe Bulat, and explained the plan to speak with Plaintiff. Specifically,
Bulat, Hlady, and Zolotko would meet with Plaintiff; "get a statement from [Plaintiff] regarding
his side of the story"; and "[i]f there is no compelling reason to keep him, we will terminate his
employment." Zolotko Decl. ¶ 10, Ex. 8. Zolotko also emailed Erich Wilson, Schnitzer's Chief
Human Resources Officer, and advised him that Dyck, Hlady, and Zolotko agreed that
"termination is the appropriate level of discipline since [Plaintiff's] behavior is in violation of the

Code of Conduct policy and the anti-harassment policy in addition it is not the behavior we expect of a leader/foreman." Zolotko Decl., Ex. 9. Zolotko reviewed the plan to get Plaintiff's statement and if he "does not provide any compelling information, we will move forward with termination. Due to [Plaintiff's] history, [Bulat] may have an armed guard on the plant site during [Plaintiff's] cooling off period (roughly a week)." *Id.*

On January 30, 2020, Dyck, Hlady, and Zolotko met with Plaintiff. Plaintiff denied sending a sexually explicit text message and making any gesture with the sausage. Zolotko advised Plaintiff that his employment was terminated. Zolotko also provided Plaintiff with a termination letter, which noted Plaintiff was terminated due to writing a sexually explicit text message to his wife and showing the message to Mullins as well as making a rude gesture with the summer sausage. Zolotko Decl., Ex. 11.

After the meeting Plaintiff initiated an EthicsPoint complaint against Zolotko in which he asserted he was terminated "for filing a whistleblower report against" Zolotko. Creighton Decl., Ex. 2 at 1. Specifically, Plaintiff alleged

> About 2-3 months ago, [Plaintiff] inquired about his lack of raise and was referred to HR. [Plaintiff] spoke with [Zolotko] and offered to do the research for any relevant military regulations. [Zolotko] suddenly lashed out and said she did not need any help with that. [Zolotko] was yelling and in [Plaintiff's] face. . . . [Plaintiff] reported [Zolotko's] outburst to Kelli [*sic*] Pappas, Chief Compliance Officer, and there was an investigation.
>
> * * *
>
> On 1/30/2020, [Plaintiff] was terminated for ethics violations. The termination paperwork stated that during the foremen meeting on 12/19/2019, [Plaintiff] was sending explicit text messages and sharing them, and he made inappropriate gestures with a sausage. Neither allegation is true, and [Plaintiff] believes he was fired in retaliation for reporting [Zolotko].

Creighton Decl., Ex. 2 at 2-3. Plaintiff also alleged Kim Bartlett witnessed the August 2019

interaction with Zolotko, but she was not interviewed, and that Melody Osgood-Cooper was

fired in retaliation for questioning Zolotko at some point.

Creighton conducted an investigation and on February 10, 2020, issued a report in which

she concluded "[a]ll actions taken by [Schnitzer] are supported." *Id*. at 4. Creighton noted

Bartlett was interviewed about Plaintiff's August 2019 interaction with Zolotko and Osgood-

Cooper was let go as part of a reduction in force that "impacted individual positions company-

wide." Creighton Decl., Ex. 2 at 5. Creighton also noted she spoke with Hlady and West

regarding the events at the foremen meeting, spoke with Zolotko about what led to Plaintiff's

termination, and reviewed video to see if it showed what occurred at the meeting. Creighton

found that none of these things indicated Plaintiff's termination was retaliatory.

Creighton noted her investigation revealed that prior to the termination meeting Plaintiff

sent to West a screen shot of a text in which Mullins informed Plaintiff that when Mullins left the

foremen meeting, he "told [Murphy] . . . what [Plaintiff] showed [Mullins]" at the foremen

meeting (*i.e.*, the sexually explicit text). *Id*. Plaintiff then sent a text to West stating "So that cunt

who tried to bait me into hitting him today got me fired! Serious question, is the mill better off

without me and keeping him? Melody, 16 years .... Robert, 14 years .... Both LOVE working

there .... both filed complaints against her .... both fired. Dennis Murphy is the Whistleblower.

CONFIRMED." *Id.* Creighton concluded the decision to terminate Plaintiff's employment

"based off of his confirmed behavior was appropriate and substantiated as his behavior was a

violation of Schnitzer's Code Of Conduct and Anti-Harassment policy." *Id*.

After his termination Plaintiff filed a claim with the Oregon Employment Department

("OED"). On April 14, 2020, an administrative law judge held a hearing at which Plaintiff

testified that, among other things, he filed his EthicsPoint complaint against Zolotko "for the military stuff" and Zolotko "never knew that . . . [Plaintiff] had a disability." Morgan Decl., Ex. 8 at 3.

At some point Plaintiff also "requested assistance [from the United States Department of Labor] in determining and exercising his employment and reemployment rights under USERRA and restoring him to his former position at" Schnitzer. Morgan Decl., Ex. 9 at 1. On May 6, 2020, the United States Department of Labor ("USDOL") sent a letter to Schnitzer stating that Plaintiff alleges he was "retaliated against for attempting to enforce his USERRA rights. Specifically, [Plaintiff] contends that he was terminated . . . in part for trying to explain to HR manager Diana Zolotko, what his USERRA rights were relating to his pay for the time he was deployed." *Id.* at 1-2. Plaintiff also alleged Zolotko "made . . . West rewrite his . . . 2019 performance evaluation after he tried to explain his USERRA rights" and that he did not receive pay increases while he was deployed. *Id.* at 2. On August 19, 2020, the USDOL advised Schnitzer that Plaintiff had added the following allegation to his "current USERRA claim": he "was discriminated against for performing military service." Morgan Decl., Ex. 9 at 4.

The USDOL conducted an investigation that included gathering witness statements from individuals involved in Plaintiff's termination. On August 25, 2020, West signed a witness statement in which he noted Plaintiff was terminated "for inappropriate behavior." Morgan Supp'l. Decl., Ex. 10 at 1. West provided examples of other employees who were terminated for "the same or similar reasons" as Plaintiff and stated he did not believe Plaintiff's termination was related in any way to his "membership in or affiliation to the Uniformed Services." *Id*. at 2. West stated he "did not rewrite [Plaintiff's 2019 performance evaluation]. It was wordsmith [*sic*] by me and . . . Hlady together because it was thought that some of my comments might have been

considered adversarial." *Id*. at 3. West explained that Zolotko "thought some of what [West] wrote was adversarial. . . . [W]e took out one sentence and resubmitted it. . . . None of the overall context of the review was changed. . . . The score was not changed." *Id*. West stated that he did not "feel pressure to change [Plaintiff's] performance review," rather he was told by his supervisor that he "needed to be more critical of all of [his] foremen." *Id*. West also noted he was "not even aware that [Plaintiff] was having issues with" USERRA and pay raises at the time he completed Plaintiff's performance evaluation. *Id*.

On September 1, 2020, Hlady signed a USDOL witness statement in which he noted that he, Dyck, and Zolotko jointly decided to terminate Plaintiff's employment due to Plaintiff's "conduct during [the foremen] meeting . . . that . . . was inappropriate or unbecoming of a leader or foreman of" Schnitzer. Snyder Decl., Ex. 17 at 2. Hlady named another employee who had been terminated in the past for behavior that was the same or similar to that engaged in by Plaintiff. Hlady explained that Zolotko suggested West rewrite a portion of Plaintiff's 2019 performance evaluation because West "was too directly addressing [Plaintiff's] self-assessment comments." *Id*. at 4. Hlady worked with West to revise Plaintiff's review, but Plaintiff's performance review score did not change. Hlady also stated he did not believe Plaintiff was terminated as a result of his efforts to enforce his USERRA rights relating to pay raises or due to his military service nor did he believe that Plaintiff's performance review was changed due to these factors.

On June 6, 2021, Plaintiff filed a Complaint in this Court asserting claims for discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, against Schnitzer; retaliation in violation of the ADA against Schnitzer; interference in violation of the ADA against Schnitzer; violation of the Family and Medical Leave Act ("FMLA"), 29

U.S.C. § 2601, *et seq.*, against Schnitzer; violation of the Oregon Rehabilitation Act ("ORA"), Oregon Revised Statute § 659A.103, *et seq.*, against Schnitzer; wrongful termination against Schnitzer; aiding and abetting discrimination against Zolotko; and abuse of civil process against Zolotko.

On July 2, 2021, Defendants filed a Motion to Dismiss Plaintiff's Complaint for failure to state a claim. On July 7, 2021, Plaintiff filed an Amended Complaint adding further factual allegations in support of his claims. On November 16, 2021, the Court granted Defendants' Motion to Dismiss and granted Plaintiff leave to file a Second Amended Complaint.

On December 16, 2021, Plaintiff filed a Second Amended Complaint in which he alleges claims for discrimination and retaliation in violation of the ADA against Schnitzer, violation of the ORA against Schnitzer, and aiding and abetting discrimination against Zolotko.

On March 17, 2023, Defendants filed a Motion for Summary Judgment. On April 21, 2023, Defendants filed a Reply and Motion to Strike. The Court took Defendants' Motions under advisement on April 28, 2023.

## DEFENDANTS' MOTION TO STRIKE

In their Motion to Strike, Defendants request the Court strike the Declaration of Cameron West, ECF 55, submitted in support of Plaintiff's Response to Defendants' Motion for Summary Judgment or, in the alternative, strike specific paragraphs of West's Declaration and to exclude 43 paragraphs of Plaintiff's Declaration submitted in support of Plaintiff's Response to Defendants' Motion for Summary Judgment.

**I.    West Declaration**

Defendants move to strike West's Declaration in its entirety or to strike paragraphs 8, 13, 14, and 20 of that Declaration on the basis that those portions of the Declaration "are a sham, and

directly contradict prior testimony given by" West in the USDOL investigation "which was given under oath and subject to penalty of perjury." Defs.' Mot. to Strike, ECF 56, at 2.

Defendants also assert nine different paragraphs of West's Declaration should be stricken because they lack foundation, fail to show personal knowledge, are hearsay, and/or are speculation and, therefore, do not contain admissible evidence.

The Court denies Defendants' Motion to Strike to the extent that it declines to strike West's entire Declaration. The Court grants Defendants' Motion to Strike to the extent that it will disregard the portions of West's Declaration that are contradicted by his sworn statement to the USDOL and/or do not contain admissible evidence.

## II.    Plaintiff's Declaration

Defendants request the Court exclude 43 paragraphs of Plaintiff's Declaration on the grounds that they contain irrelevant information, hearsay, and/or speculation; lack foundation and/or personal knowledge; and/or "run afoul of the best evidence rule."

The Court grants Defendants' Motion to Strike to the extent that it will disregard the portions of Plaintiff's Declaration that do not contain admissible evidence.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants assert they are entitled to summary judgment on Plaintiff's ADA and ORA disability claims because Plaintiff has not shown he is disabled within the meaning of the ADA or the ORA, he cannot show he was terminated because of his disability, and Defendants terminated Plaintiff for legitimate and non-discriminatory reasons that were not mere pretext. Defendants assert they are entitled to summary judgment on Plaintiff's ADA and ORA retaliation claims because Plaintiff did not engage in a protected activity, Plaintiff cannot show a "but-for" causal link between his alleged protected activity and his termination, and Defendants

terminated Plaintiff for legitimate and non-discriminatory reasons that were not mere pretext.

Finally, Defendants contend they are entitled to summary judgment on Plaintiff's aiding and

abetting claim because Plaintiff cannot show that Zolotko intended to retaliate against him or that

she acted to aid in retaliation on the basis of disability.

## I.   Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

(9th Cir. 2009)(internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007)(citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108,

1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    ADA and ORA Discrimination Claims[3]

As noted, Defendants assert they are entitled to summary judgment on these claims

because Plaintiff has not shown he is disabled within the meaning of the ADA or the ORA, he

cannot show his alleged disabilities were the "but-for" cause of his termination, and Defendants

terminated Plaintiff for legitimate and non-discriminatory reasons that were not mere pretext.

### A.    Standard

Title I of the ADA prohibits covered employers from discriminating against "a

qualified individual on the basis of disability in regard to . . . discharge of employees, employee

compensation,. . . and other terms, conditions, and privileges of employment. 42 U.S.C. §

12112(a). In resolving summary-judgment motions for ADA claims, courts apply the burden-

shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kannan v.*

*Apple, Inc*., No. 20-17211, 2022 WL 3973918, at *1 (9th Cir. Aug. 31, 2022). *See also Raytheon*

*Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003) (applying *McDonnell Douglas* burden-shifting

framework to ADA disability-discrimination claim). Under that framework, the plaintiff must

first establish a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

506 (1993). To establish a *prima facie* case under the ADA the plaintiff must show that "(1) [ ]he

is disabled within the meaning of the ADA; (2) [ ]he is a qualified individual able to perform the

essential functions of the job with reasonable accommodation; and (3) [ ]he suffered an adverse

---

[3] "Claims under the ORA are evaluated using the same legal standard as the federal ADA." *Kelly v. Boeing Co*., 848 F. App'x 692, 694 (9th Cir. 2021)(citing *Snead v. Metropolitan Property & Cas. Ins. Co*., 237 F.3d 1080, 1087 (9th Cir. 2001)). Accordingly, the Court evaluates Plaintiff's ADA and ORA disability claims together.

employment action because of [his] disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quotation omitted). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendants do so, the burden of proof shifts back to the plaintiff to show that the proffered reason is pretextual. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1062 (9th Cir. 2002).

      **B.**    *Prima Facie* **Case**

      Defendants assert Plaintiff has not made out a *prima facie* case of disability discrimination because Plaintiff has not established he is disabled within the meaning of the ADA or the ORA or that he suffered an adverse employment action because of his disability.

      **1.**    **Disabled within the meaning of the ADA and ORA**

      The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Whether an impairment substantially limits a major life activity is determined by (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) is permanent or long-term impact or expected permanent or long-term impact. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1222 (9th Cir. 2022)(citations omitted). The ADA makes clear that the "definition of disability . . . shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). Nevertheless, not every medical condition or impairment will constitute a disability with the meaning of the ADA. 29 C.F.R. § 1630.2(j)(1)(ii).

      Plaintiff alleges in the SAC that his "disabilities include [PTSD] and [TBI] that substantially impair his "major life activities of memory, concentration, seeing, mood or

motion, and speech." SAC ¶ 13. Plaintiff states in his Declaration that while serving in Iraq in

2004 he "suffered injuries to [his] head and body including damage to [his] brain, impairment of

hearing, and anxiety." Pl. Decl. ¶ 6. Plaintiff alleges he "received medical treatment and

counseling at the Veterans Administration Medical Center in Portland for [PTSD]." *Id.* ¶ 9. The

record, however, does not contain a diagnosis or treatment notes by any medical professional for

Plaintiff's conditions.

        To support his allegation that he has the disabilities of PTSD and TBI

Plaintiff relies on his Declaration in which he testifies that due to his PTSD he was unable to

work in the "melt shop" in 2006 and that his PTSD caused him to suffer an anxiety attack in

2007 when he "became stuck between two moving trains." Pl. Decl. ¶¶ 12, 14. The record,

however, indicates Plaintiff was able to work successfully in many other areas at Schnitzer and

received a promotion to yard foreman in 2013. Plaintiff also relies on a handicapped parking

placard issued by the Oregon Department of Motor Vehicles. The placard, however, does not

indicate why it was issued and states only "Oregon wounded warrior." Plaintiff also points to a

February 11, 2022 summary of benefits letter issued by the VA that states Plaintiff's "combined

service-connected evaluation is 80 PERCENT." Morgan Decl., Ex. 4 at 1-3. The letter from the

VA, however, does not set out the conditions that resulted in its rating, indicate how Plaintiff's

conditions affect a major life activity, or indicate when the 80 percent rating began.

        Under similar circumstances courts have concluded plaintiffs have not

established they are disabled within the meaning of the ADA. For example, in *Coons v.*

*Secretary of United States Department of Treasury*, the plaintiff submitted a letter from his

doctor stating he suffered from various physical and mental impairments and was receiving

treatment. 383 F.3d 879, 886 (9th Cir. 2004). The Ninth Circuit held that this evidence alone

failed to establish a record of an impairment that substantially limits a major life activity because the letter did not articulate how the plaintiff's impairments affected any major life activity. *Id.* *See also* *Vinson v. Gen. Motors LLC*, No. CV-20-01077-PHX-SMB, 2022 WL 1540169, at \*5 (D. Ariz. May 16, 2022)(court found Plaintiff did not provide sufficient evidence to show he was disabled under the ADA when the plaintiff submitted a letter from his doctor noting the plaintiff "has a history of hypertension and intermittent fluid retention" and asserted that "he was diagnosed with polycythemia vera, a medical condition that results in his body producing too many red blood cells," however there was "no medical evidence presented as to what life activities [were] substantially limited by [the plaintiff's] condition").

The Court concludes Plaintiff has not established his PTSD and/or TBI substantially limits one or more of his major life activities. Accordingly, Plaintiff has not established he has a disability within the meaning of the ADA or the ORA.

### 2.    Adverse Employment Action

Plaintiff alleges in the SAC that the "termination of Plaintiff's employment was not based on fact and instead was motivated because Plaintiff is disabled." SAC ¶ 41.[4] Defendant asserts that even if Plaintiff has established that he is disabled within the meaning of the ADA, he has not established that he was terminated because of his alleged disabilities. The Court agrees.

---

[4] To the extent that Plaintiff alleges in his Response that his 2019 performance review was an adverse action, Plaintiff did not allege that as a basis for his disability claims in any of his complaints. In *Pickern v. Pier 1 Imports (U.S.), Inc.*, the Ninth Circuit concluded that the district court properly rejected new factual bases for the plaintiff's ADA claim that were raised for the first time at summary judgment on the grounds that those new bases violated Rule 8. 457 F.3d 963, 968 (9th Cir. 2006). The Court, therefore, evaluates only Plaintiff's termination as an adverse employment action.

The Ninth Circuit has held that in order to satisfy the third prong of the *prima facie* analysis a Plaintiff must show the "adverse employment actions "would not have occurred but for [his] disability." *Kannan v. Apple, Inc.*, No. 20-17211, 2022 WL 3973918, at *1 (9th Cir. Aug. 31, 2022)(quoting *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019)). Defendants assert there is no indication that Plaintiff would not have been terminated but for his alleged disabilities. As a preliminary matter Defendants point out that the evidence reflects Plaintiff himself does not believe he was terminated because of his disability. Instead, Plaintiff believes he was terminated for either attempting to assert his rights under USERRA or for filing an EthicsPoint complaint against Zolotko concerning his USERRA rights. For example, Plaintiff testified at deposition as follows:

> Q:    Okay. So your position, make sure I'm a hundred percent clear, is that Diana Zolotko made the decision to terminate your employment on the basis of a disability.
>
> A:    No, that's—no, no, that is definitely not what I said.
>
> Q:    Okay. Let me try this again. It's your position that Diana Zolotko terminated your employment in retaliation for filing the ethics complaint.
>
> A:    Correct.

Morgan Decl., Ex. 5 at 14-15. Plaintiff alleged in his complaint to the USDOL that he was "retaliated against for attempting to enforce his USERRA rights. Specifically, [Plaintiff] contends that he was terminated . . . in part for trying to explain to HR manager Diana Zolotko, what his USERRA rights were relating to his pay for the time he was deployed." *Id.* at 1-2. Morgan Decl., Ex. 9 at 1. In addition, at his OED hearing Plaintiff testified under oath that he filed his EthicsPoint complaint against Zolotko "for the military stuff" and Zolotko "never knew that . . . [Plaintiff] had a disability." Morgan Decl., Ex. 8 at 3.

The record also reflects that the final decisionmaker, Dyck, did not know that Plaintiff was allegedly disabled. Dyck, Hlady, and Zolotko testify in their Declarations that Dyck's "ultimate approval was required" to terminate Plaintiff's employment. Dyck Decl. ¶ 3. Dyck testified that during the meeting to discuss discipline for Plaintiff's actions at the foremen meeting Dyck, Hlady, and Zolotko "did not discuss [Plaintiff's] medical conditions, impairments, or disabilities" and Dyck was not aware at the time of that meeting that Plaintiff "claimed to have [PTSD] or a [TBI]." Courts have held under similar circumstances that plaintiffs have failed to prove they would not have been terminated but for their disabilities. *See, e.g., Kannan v. Apple, Inc.,* No. 20-17211, 2022 WL 3973918, at *1 (9th Cir. Aug. 31, 2022) ("The employment actions at issue were subject to final approval by Kotni's manager, not Kotni. It is undisputed that Kotni's manager did not know that [the plaintiff] had an autistic son and did not perceive [the plaintiff] as autistic at any point during [the plaintiff's] employment at Apple. He thus could not have denied [the plaintiff] a promotion and Discretionary RSUs because of a . . . disability."); *Barrier v. City of the Dalles*, No. 3:18-CV-1084-AC, 2020 WL 9549996, at *14 (D. Or. Dec. 21, 2020), report and recommendation adopted, No. 3:18-CV-1084-AC, 2021 WL 1265203 (D. Or. Apr. 6, 2021)(The plaintiff "fails to establish a causal link between his termination and a disability [because] . . . he has not provided any evidence that Anderson or the City had any knowledge of a disability that could have motivated the termination."); *Lucke v. Multnomah County*, No. CV-06-1149-ST, 2008 WL 4372882, at *36 (D. Or. Sept. 22, 2008)("to establish causation, the plaintiff must show that the defendant had knowledge of her disability when making the adverse employment decision."); *Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 WL 4899603, at * 18 (D. Ariz. Oct. 8, 2018)("It is clear that

if the District were truly unaware that such disability existed, it would be impossible for [any adverse employment action] to have been based, even in part on [Plaintiff's] disability.").

      Plaintiff asserts in his Response that he has established but-for causation because there is "no record of a policy violation by [Plaintiff] rising to the level of a terminable offense." Pl. Resp. at 23. In their witness statements provided during the USDOL investigation, however, both West and Hlady identified other Schnitzer employees who had been terminated for the "same or similar" conduct as that engaged in by Plaintiff at the foremen meeting.

      On this record the Court concludes Plaintiff has not established his alleged disabilities were the but-for cause of his termination. Accordingly, the Court concludes Plaintiff has not established a *prima facie* case of disability discrimination under the ADA or ORA.

### C.    Legitimate, Non-discriminatory Reasons for Termination

      Defendants assert that even if Plaintiff has established a *prima facie* case of disability discrimination, Defendants had legitimate, non-discriminatory reasons for terminating Plaintiff's employment: Plaintiff's history of performance issues and his actions at the December 2019 foremen meeting. As noted, Mullins stated in response to the January questionnaire that Plaintiff sent a sexually explicit text to his wife and showed it to Mullins during the foremen meeting. Murphy called Hlady the day after the foremen meeting and reported that Plaintiff showed Mullins a sexually explicit text during the foremen meeting. Two other individuals at the foremen meeting also reported in response to the questionnaire that Mullins told them Plaintiff showed him a sexually explicit text during the foremen meeting. Finally, Mullins and Murphy both reported that Plaintiff made a sexual gesture with the sausage during the meeting. In addition, Dyck, Hlady, and Zolotko testified in their Declarations that on January 21, 2020, they met to discuss Plaintiff "and his behavior at the [foremen] Meeting." Dyck Decl. ¶ 3. They

"reviewed [Plaintiff's] FY2019 performance review and noted [Plaintiff] had a history of inappropriate behavior." *Id.* Ultimately, they agreed Plaintiff's behavior was inappropriate and termination was the correct response to Plaintiff's history and actions. *Id.* The January 30, 2020 termination letter also noted Plaintiff was terminated due to writing a sexually explicit text message to his wife and showing the message to Mullins as well as making a "sexually explicit" gesture with the summer sausage. Zolotko Decl., Ex. 11. Further, both West and Hlady identified in their USDOL statements individuals that had been terminated by Schnitzer in the past for engaging in behavior that was the same as or similar to Plaintiff's actions.

To the extent that Plaintiff asserts he did not have a history of performance issues, and, therefore, that could not be a legitimate, nondiscriminatory basis for his termination, that assertion is unsupported by the record, In fact, the record reflects that on October 3, 2018, Plaintiff was issued a notice of corrective action for the following incident:

> On 9/20/18, [Plaintiff] (Transportation Foreman) had a conversation with coworker Steve Osgood (Transportation Foreman) saying that he told their supervisor, Cameron West, that "you have one "tard (retard)" training another "tard", which produces a tard" referring to the job cross training that [Osgood] and Van Sichler (Transportation Foreman) were doing. [Plaintiff] also asked [Osgood] if he knew what his nick name was. When [Osgood] said "no", [Plaintiff] told him it was Oz-nogood.

Morgan Decl., Ex. 5 at 19. Plaintiff also had interpersonal issues with several employees. For example, on July 30, 2019, an employee, Chad Plala, emailed Hlady and West to inform them that he witnessed Plaintiff shouting at another employee, Van Sichler, and when Van Sichler asked Plaintiff if he wanted "to go somewhere else so we can talk privately," Plaintiff responded "You wanna go outside?" Van Sichler "then said, 'I'm just asking if you want to go talk privately about this.' [Plaintiff] then said, 'Do you wanna f****** go outside and handle

this?' Van stayed silent after this. [Plaintiff] then said, 'You're going to get us all f***** up

doing this sh**." Morgan Decl., Ex. 5 at 25. Plala wrote that he felt Plaintiff "was threatening

Van [Sichler] . . . asking him to step outside. . . . [Plaintiff] was visibly angry and stepping close

to Van [Sichler] challenging him. . . . Van [Sichler] did nothing to trigger this response from

[Plaintiff]." *Id*. at 25-26.

      The Court concludes on this record that Defendants have established they had

legitimate, nondiscriminatory reasons for terminating Plaintiff's employment.

### C.    Pretext

      A plaintiff "may establish pretext 'either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence.'" *Godwin v. Hunt Wesson, Inc*., 150

F.3d 1217, 1220 (9th Cir. 1998)(quoting *Burdine*, 450 U.S. at 256). Indirect evidence "'must be

both specific and substantial to overcome the legitimate reasons put forth by' the employer."

*Clark v. Mirage Casino-Hotel, Inc.*, 815 F. App'x 150, 151 (9th Cir. 2020)(quoting *Aragon v.

Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002)).

      Plaintiff does not point to any direct evidence that Defendants' legitimate,

nondiscriminatory reasons were pretextual. Plaintiff instead asserts Defendants' reason for his

termination are unworthy of credence because Plaintiff "was told by multiple employees at

[Schnitzer] that Zolotko hated him" and "the only two witnesses in a room full of people [at the

foremen meeting] who claim to have seen [Plaintiff] gesturing with a sausage and typing an

inappropriate text were the only two people in the room with a history of disliking" Plaintiff.

Pl.'s Resp. at 26.

The first reason offered by Plaintiff is mere speculation and, therefore, is insufficient to rebut a legitimate, nondiscriminatory reason. Plaintiff does not identify in his Response the individuals who allegedly told him that Zolotko hated him. In paragraph 23 of the SAC Plaintiff alleges that Cooper-Osgood told him in "late 2018 or early 2019 . . . that she heard [Zolotko] say she hates Plaintiff . . . [and] will get Plaintiff." Plaintiff, therefore, may be referring to Cooper-Osgood in his Response. To the extent that Plaintiff is referring to Cooper-Osgood, however, she testified at deposition as follows:

> Q:    Okay. Did you ever hear Ms. Zolotko make statements about Mr. Andrade that were derogatory?
>
> A:    No.
>
> Q:    Did you ever hear Ms. Zolotko state that she disliked Mr. Andrade?
>
> A:    No.
>
> Q:    Did you tell Mr. Andrade that he had a target on his back with Ms. Zolotko?
>
> A:    No.
>
> Q:    Did you ever tell Mr. Andrade that Ms. Zolotko disliked him or hated him?
>
> A:    No.

Morgan Supp. Decl., Ex. 11 at 2. Accordingly, even if Zolotko's alleged dislike of Plaintiff was sufficient to rebut Defendants' legitimate, nondiscriminatory reasons for terminating Plaintiff, which is questionable,[5] Plaintiff's unsupported statement is insufficient in light of Cooper-

---

[5] Courts have found that allegations of dislike of a plaintiff by a decisionmaker are insufficient to establish pretext. *See, e.g., Darvishian v. Geren,* 404 F. App'x 822, 830 (4th Cir. 2010)("[While the above evidence cited by Darvishian supports an inference that Thompson disliked Darvishian personally, this evidence does not establish" pretext.); *Lomotey v. Connecticut-Dep't of Transp.,* 355 Fed. App'x 478, 482 (2d Cir. 2009)("[I]ncidents of conflict" and evidence of being

Osgood's testimony. *See Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir. 2003)(The plaintiff "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements.").

      Plaintiff's second reason is also insufficient to establish that Defendants' proffered legitimate, nondiscriminatory reasons are pretextual. Although Plaintiff asserts that only Mullins and Murphy reported the text message to Zolotko, Andre and Lovas indicated in their answers to the questionnaire that Mullins told both of them on the way out of the meeting about the text message and both indicated that they believed it was inappropriate for Plaintiff to have shared that message with Mullins. In addition, the Ninth Circuit has made clear that merely attacking the credibility of witnesses relied on by the employer is insufficient to establish pretext. For example, in *Villiarimo*, the plaintiff "attack[ed] the credibility of . . . three witnesses" in an effort to establish pretext. 281 F.3d at 1063. The court found the plaintiff's attacks to be "unavailing" and noted when "judging whether [the defendant's] proffered justifications were 'false,' it is not important whether they were objectively false (*e.g.*, whether [the plaintiff] actually lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Id.* (quotation omitted). The court found the plaintiff did not establish pretext because she did not present any evidence that the defendant "did not honestly believe its proffered reasons." *Id.* Similarly, here Plaintiff does not

---

"disliked" are not evidence of retaliation, and "attacks on the [defendant's] credibility are insufficient to constitute circumstantial evidence of pretext."); *Hayward v. Thuge*, No. 07-10622-BC, 2009 WL 1086765, at *24 (E.D. Mich. Apr. 22, 2009)("Defendant Thuge's dislike of Plaintiff, even if it were distinguishable from his alleged rude managerial style used to govern all employees, would be insufficient to show pretext.")

point to any evidence that Dyck, Hlady, and Zolotko did not honestly believe Plaintiff showed a sexually explicit text to Mullins or that he made a sexual gesture with the sausage in the foremen meeting.

On this record the Court concludes Plaintiff has not established a genuine dispute of material fact exists as to whether Defendants terminated Plaintiff because of a disability. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's ADA and ORA disability discrimination claims.

## III.    ADA and ORA Retaliation Claims[6]

Plaintiff alleges in his second and third claims that Defendants retaliated against him "for pursuing [his] rights in accordance with the ADA [and the ORA] and reporting Zolotko's discrimination, retaliation, and intimidation against Plaintiff." SAC ¶P 51, 61.

Defendants assert they are entitled to summary judgment on Plaintiff's ADA and ORA retaliation claims because Plaintiff did not engage in a protected activity, Plaintiff cannot show a "but-for" causal link between his alleged protected activity and his termination, and Defendants terminated Plaintiff for legitimate and non-discriminatory reasons that were not mere pretext.

### A.    Standards

The Ninth Circuit applies the "burden-shifting framework, as established in *McDonnell Douglas* . . . to retaliation claims under the ADA." *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472–73 (9th Cir. 2015).

To establish a *prima facie* case of retaliation a plaintiff must show "(a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that

---

[6] "Claims under the ORA are evaluated using the same legal standard as the federal ADA." *Kelly,* 848 F. App'x at 694 (citing *Snead,* 237 F.3d at 1087). Accordingly, the Court evaluates Plaintiff's ADA and ORA retaliation claims together.

there was a causal link between the two." *Id.* (citation omitted). ADA "retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). If the plaintiff makes out a *prima facie* case, "[t]he burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014)

> **B.** *Prima Facie* **Case Elements**

> **1.** **Protected Activity**

Protected activity under the ADA includes: "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" the ADA. 42 U.S.C.A. § 12203.

Defendants do not dispute that pursuing one's rights under the ADA constitutes protected activity. Defendants, however, assert there is no evidence that Plaintiff pursued his rights under the ADA or ORA, rather Plaintiff pursued his USERRA rights. The record reflects Plaintiff made numerous complaints to various managers and human resources personnel regarding his belief that he did not receive proper wages or raises while he was deployed in violation of USERRA. For example, when Plaintiff returned to Schnitzer after his military service in 2015 he advised Moore and Hlady that he believed he did not receive appropriate pay in violation of the USERRA. In July 2019 Hlady advised Zolotko that Plaintiff had asked Hlady "for a raise multiple times recently" and advised Hlady that "he might go to a JAG . . . in the  belief that he is underpaid compared to his peers because of his previous military duty." Hlady Decl., Ex. 1 at 1. On October 8, 2019, Plaintiff met Pappas and asserted that he had

not received two pay increases in violation of USERRA. Pappas Decl., Ex. 1 at 1. Plaintiff told

Pappas that he had spoken with Zolotko about USERRA, but she got angry when Plaintiff

suggested she did not understand USERRA. The EthicsPoint complaint that Pappas initiated on

Plaintiff's behalf indicated Plaintiff believed Schnitzer violated USERRA and Zolotko retaliated

against him for questioning Schnitzer's compliance with USERRA. The EthicsPoint complaint

that Plaintiff opened after his termination alleged USERRA violations and retaliation for

reporting USERRA issues. Finally, the USDOL matter opened by Plaintiff referenced only

USERRA violations and retaliation. There is no indication that Plaintiff pursued his rights under

the ADA.

    To the extent that Plaintiff alleges he engaged in protective activity when

he either disclosed or attempted to disclose to Zolotko that he had PTSD and/or a TBI, although

requesting an accommodation is a protected activity for purposes of the ADA's anti-retaliation

provision, "mere disclosure of one's disability is not a request for accommodation." *Colasanti v.

City of Portland*, No. 3:19-CV-00443-YY, 2021 WL 4317286, at *9 (D. Or. Aug. 19, 2021),

report and recommendation adopted, No. 3:19-CV-00443-YY, 2021 WL 4317667 (D. Or. Sept.

20, 2021)(citing *Manning v. Tacoma Pub. Sch*., No. C06-5078 RBL, 2007 WL 2495138, at *14

(W.D. Wash. Aug. 30, 2007) (finding the plaintiff's disclosure of her dyslexia was not a vigorous

assertion of her rights under the ADA and was therefore not a protected activity); *Lackey v.

Heart of Lancaster Reg'l Med. Ctr*., No. CV 15-415, 2016 WL 5461185, at *8 (E.D. Pa. Sept. 29,

2016)(finding the plaintiff had not engaged in protected activity under the ADA when she

disclosed her panic attacks but presented no evidence that she requested an accommodation as a

matter of law)). *See also Brown v. Vanguard Grp., Inc*., No. CV 16-946, 2017 WL 412802, at

*17 (E.D. Pa. Jan. 30, 2017), dismissed, No. 17-1461, 2017 WL 3911584 (3d Cir. Apr. 13,

2017)("simply disclosing that you have a disability is not engaging in a protected activity because it is neither an act of participating in a proceeding under the ADA, nor an opposition to discrimination made unlawful by the ADA."). The Court, therefore, concludes on this record that Plaintiff has not established that he engaged in a protected activity under the ADA or the ORA.

2.    **Adverse Action**

It is undisputed that Plaintiff was terminated and that termination is an adverse employment action. In his Response to Defendants' Motion for Summary Judgment, however, Plaintiff asserts for the first time that he also suffered the adverse action of a poor performance evaluation in 2019.

In *Pickern v. Pier 1 Imports (U.S.), Inc*., the Ninth Circuit concluded that the district court properly rejected new factual bases for the plaintiff's ADA claim that were raised for the first time at summary judgment on the grounds that those new bases violated Rule 8. 457 F.3d 963, 968 (9th Cir. 2006). Specifically, the court found the plaintiff failed to "give the defendant fair notice of what the plaintiff's claim [was] and the grounds upon which it rest[ed]." *Id.* (quotation omitted). When, as here, a plaintiff "does not assert a new theory of liability and instead raises new factual bases and instead argues the same theory on the basis of a different set of facts, as in *Pickern* . . . the proper inquiry . . . is the notice provided under Rule 8 rather than the prejudice to Defendants." *Harris v. Kyle*, No. 119CV00462DADEPG, 2022 WL 977050, at *12 (E.D. Cal. Mar. 31, 2022).

Plaintiff did not allege in any of the three complaints filed in this matter that the adverse employment action supporting his ADA and/or ORA retaliation claims was his 2019 performance evaluation. Rather, Plaintiff alleged only that his termination was the adverse employment action taken by Defendants. The Court, therefore, concludes Plaintiff's complaints

did not provide notice to Defendants that Plaintiff's ADA and/or ORA retaliation claims

encompassed the 2019 performance evaluation. Accordingly, the Court concludes Plaintiff's

arguments based on his 2019 performance evaluation are improperly raised on summary

judgment and do not create a dispute of fact regarding Plaintiff's retaliation claims. *See Wasco*

*Prods., Inc., v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)("[S]ummary judgment

is not a procedural second chance to flesh out inadequate pleadings.")(citation and internal

quotation marks omitted)). The Court, therefore, evaluates only Plaintiff's termination as an

adverse employment action.

### 3.  Causal Link

Plaintiff's argument regarding a causal link in his Response solely

addresses his 2019 performance evaluation. For the reasons noted, those arguments are

improperly raised on summary judgment. In addition, Dyck, who was the final decisionmaker in

Plaintiff's termination, testified in his Declaration that at the time he made the decision to

terminate Plaintiff he was unaware that Plaintiff had made any EthicsPoint complaint against

Zolotko. Dyck Decl. ¶ 4.

On this record the Court concludes Plaintiff has not established his alleged

protected activity was the but-for cause of his termination. Accordingly, the Court concludes

Plaintiff has not established a *prima facie* case of retaliation under the ADA or ORA.

### C.  Legitimate, Nondiscriminatory Reason

Defendants assert even if Plaintiff has established a *prima facie* case of

retaliation, Defendants had legitimate, non-discriminatory reasons for terminating Plaintiff's

employment: Plaintiff's history of performance issues and his actions at the December 2019

foremen meeting. For the reasons the Court concluded Defendants have set out legitimate,

nondiscriminatory reasons for Plaintiff's termination as to Plaintiff's disability discrimination claims, the Court also concludes Defendants have satisfied this factor as to Plaintiff's retaliation claim.

### D.    Pretext

Plaintiffs who litigate ADA retaliation claims that reach the pretext stage "must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered non-discriminatory reason is merely a pretext for discrimination." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). In addition, "circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Brown v. City of Tucson*, 336 F.3d 1181, 1188 (9th Cir. 2003)(internal alteration and citation omitted). *Glass v. Asic N., Inc.*, 848 F. App'x 255, 258 (9th Cir. 2021).

Plaintiff does not make any specific argument in response to Defendants' articulated legitimate, nondiscriminatory reasons for Plaintiff's termination and the Court does not find on this record that there is a material dispute of fact as to whether Defendants' legitimate, nondiscriminatory reasons were mere pretext for Plaintiff's termination.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's retaliation claims under the ADA and the ORA.

## IV.    Aiding and Abetting

Plaintiff alleges:

> Zolotko expressed hostility and distain towards Plaintiff after he attempted to discuss his disability with her. Plaintiff reported her discrimination and retaliation and she then fabricated a reason to terminate his employment. The termination of Plaintiff's employment was not based on fact. Defendant Zolotko aided, abetted, incited, compelled or coerced Defendants Schnitzer Steel and Cascade Steel Rolling Mills in their

discrimination and retaliation against Plaintiff . . . [in violation of] ORS
659A.030(1)(g).

SAC ¶ 71.

Oregon Revised Statute § 659A.030(1)(g) provides it is an unlawful employment practice
"[f]or any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the
doing of any of the acts forbidden under [Chapter 659A] or to attempt to do so." Courts in
Oregon, however, have held that a plaintiff's "failure to make a *prima facie* showing of . . .
discrimination is fatal to his claim of aiding and abetting." *Committe v. AACSB Int'l*, No. 3:20-
CV-00372-JR, 2022 WL 1137868, at *5 (D. Or. Mar. 15, 2022), report and recommendation
adopted sub nom. *Bruce Committe v. AACSB Int'l*, No. 3:20-CV-00372-JR, 2022 WL 1137306
(D. Or. Apr. 18, 2022)(citation omitted). *See also Dinicola v. Serv. Emp. Int'l Union*, 2011 WL
3477074, *7 (D. Or. Aug. 5, 2011)(holding the plaintiff must establish a violation of the
underlying Chapter 659A laws to bring an aiding and abetting claim).

As noted, Plaintiff failed to make out a *prima facie* case of disability discrimination or
retaliation in violation of the ORA. The Court, therefore, concludes Plaintiff also has not
established his aiding and abetting claim. Accordingly, the Court grants Defendants' Motion for
Summary Judgment as to this claim.

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART Defendant's Motion to Strike,
ECF 56, and GRANTS Defendants' Motion for Summary Judgment, ECF 44. The Court

DENIES pending motions as moot.

IT IS SO ORDERED.

DATED:_____June 16, 2023_____.


MARCO A. HERNANDEZ
United States District Judge